## ADAMS vs. HASKELL.

*Fourth District Court for San Francisco Co., December,* 1857.

ASSIGNMENT — ATTACHMENT — PARTNERSHIP — JURISDICTION—RE-
CEIVER—COURT OF EQUITY—STIPULATION—DISTRIBUTION OF ASSETS.

In this state in an action in equity, the district courts have jurisdiction to dissolve part-
nerships, and may declare them void *ab initio,* if there has been fraud, imposition or
misrepresentation in the original agreement.

Where a partner has a right to dissolve the partnership, it is a matter of course to ap-
point a manager or receiver of the property.

The order appointing a receiver followed up by giving the requisite security, is treated
as an equitable sequestration of the property which vests in him as the officer of the
court without an assignment from the owners.

The court will ultimately make such disposition of the property as will preserve the
legal and equitable right of every claimant, it being the rule in equity that when
the court gains jurisdiction for one purpose, it retains it generally, for relief.

The receiver is for the benefit of all parties who may establish rights in the action.
The property is in *custodia legis* for whoever can make out a title to it. It is the court
itself which has its custody and possession ; the receiver, at common law, indepen-
dent of any statute, is the creature of the court, and cannot be disturbed by a party
or all the parties, without leave of the court. . The court will protect the property
in his possession from acts of violence or suits at law.

An equitable sequestration of property in an equity suit, is not an assignment within
the meaning of our insolvent laws.

Assets belonging to an equity suit, in court, and reduced to the possession of the re-
ceiver, are not the subject of attachment in an action at law.

After a reference and notice for all creditors to prove claims, &c., the court will not
allow the parties to stipulate away the rights of those who have intervened before
the referee.

If no preferences or priorities of payment or liens are established, the assets will be dis-
tributed *pro rata* among all the creditors.

*Shafters, Park & Heydenfeldt,* for plaintiff.

*Saunders & Hepburn,* for receiver Naglee.

*Hoge & Wilson,* for receiver Cohen.

*Stanly & Hayes, McDougal & Sharp, Mastick* and others, for
creditors intervening.

HAGER, J.—On the 23d day of Feb, 1855, plaintiff filed his original com-
plaint in this action, asking among other things, for a dissolution of the

partnership, and the taking of an account : also that defendants be restrained from carrying on or interfering with the partnership ; that a receiver be appointed to take charge of all the real and personal property, etc., and the management of the partnership, and that the assets be applied to the payment of the said partnership debts. On the 25th of June, 1855, plaintiff filed an amended complaint, containing additional and stronger allegations, and with substantially the same prayer for relief.

On the day of filing the first complaint, Feb. 23d, my predecessor in office, judge *Lake*, upon the written consent of defendants, granted an injunction and appointed a receiver, (*A. A. Cohen*,) as prayed for, and on the same day the receiver filed his bond and entered upon the performance of the duties of his office.

Subsequently on the 27th day of February, 1855, defendant *Woods*, in behalf of himself and his copartners filed, in this court, a petition of insolvency, and in that proceeding, *A. A. Cohen*, the receiver, together with *Richard Roman* and *Edward Jones*, were appointed assignees, and entered upon the performance of their duties.

*Cohen*, as receiver, took the possession and control of the partnership property and affairs, until the appointment of *Roman* and *Jones*, when the three acted jointly in the same business, until the decision of the supreme court, of July term, 1855, was rendered, pronouncing the whole proceeding in insolvency, void. After this, *Cohen*, by virtue of his first appointment, continued to be the legal receiver, until, for cause, he was removed. Then *H. M. Naglee*, the present receiver was appointed, and an order of court and demand was made on *Cohen*, *Roman* and *Jones*, to deliver to him as receiver, the assets etc., in their possession, belonging to the estate. This was refused because, among other reasons, the assets were attached by some of the creditors of *Adams & Co*. *Cohen* and *Jones* were held guilty of a contempt of court and adjudged to be imprisoned until they complied with the order. These proceedings were then carried to the supreme court, when it was held, (the judges all concurring,) as follows that *Cohen*, *Roman* and *Jones*, " were merely custodians or receivers, by virtue of the order of court. They received it from the court because *its possession by the receiver was the possession of the court.* They received it by order of the court and could consequently only hold it subject

to the direction of the court; it is in their hands and is not their property; they are surely answerable to some one for it; it can only be in the power from whence they derived it, and *whose special property it was* when they obtained it."

" It was no answer to this, to say that the fund has been attached by the garnishment of the creditors of *Adams & Co.*. It was not the subject of attachment. It was already in the hands of a receiver before any attachment issued. The receiver is the officer of the court, and the fund in his hands is in court—in the custody of the law, and can only be disposed of, by the order and direction of the court. Nor, (as was contended at the bar) is its disposition subject to be affected by any action of the immediate parties to the suit. The bill was filed for the purpose of seizing the assets of the partnership and having them distributed to the creditors. This purpose a court of chancery will carry out without regard to any attempt on the part of partners to evade or defeat it. It was the duty of the court as soon as this bill was filed, and the property was under its control, to require all the creditors of *Adams & Co.* to appear within a given time before a master to be appointed for the purpose, and have their claims audited under such rules and regulations as to notice, as would secure a fair hearing and a just account. Upon the report of the master and its confirmation *the fund would then be distributed pro rata* among the creditors *whose claims were allowed.*" *See Adams vs. Woods & Haskell*, 6 *Cal.* 113.

When the *remittitur* came down containing the unanimous opinion of the supreme court, as above given, I considered it tantamount to instructions to this court; and on the 14th day of February, 1856, made an order of reference with special instructions, to *Gilbert A. Grant, Esq.*, referee, to take account of the claims of all creditors of *Adams & Co.*, for the purpose of making a *pro rata* distribution, and to bar those who did not come in within the time limited. (See order and the minutes of February 14th and 22d, 1856.)

The time limited for proving claims was afterwards enlarged, and on the 26th day of November, 1856, the referee made and filed his report of claims proved before him, to the amount of over one and a half million of dollars. This report was afterwards confirmed, except

Adams *vs.* Haskell.

only, I believe, as to the claims purchased by and allowed to one of the attorneys of the plaintiff.

On the 14th of February, 1856, the default of the defendants was entered. (See minutes of the court, Dec. 27, 1856.)

The relief demanded in the complaint being for a dissolution of the partnership and a distribution of the assets among the creditors, after the default was entered, nothing remained to be done but the taking of an account of the claims of creditors, to enable the court to give judgment or to carry the judgment into effect, according to the provisions of our Practice Act § 150 2d ; and, for this purpose, the reference, made as above stated, was proper and according to practice.

The entry of the default, under our system of practice, was equivalent to a decree, *pro confesso*, as against defendants, who were the only parties, besides the plaintiff, who had appeared or were before the court.

Following the report of Mr. *Grant*, and on the 30th of December, 1856, a dissolution was specially decreed, and an order was made to the effect that, of the funds in the hands of the receiver, there should be paid " two per cent. to the parties entitled thereto on claims allowed and reported by referee, *Gilbert A. Grant, Esq.*, as the first dividend out of the fund in court in this action." (See order and minutes of court, Dec. 30, 1856.)

On the 28th of April, 1856, *Thomas A. Lynch, Richard Savage*, and others applied to the court for leave to file an intervention in this action, when they were informed by the court that they had the right by statute if they could intervene at all ; and the court then refused to stay proceedings in the suit, and ordered that the intervention should not be so construed as to extend the time of filing the claims of said intervenors before the referee, according to the order theretofore made. (Order and minutes, April 28, 1856.)

Under our statute a third party is entitled to intervene in an action before or after issue has been joined, either by joining the plaintiff, in claiming what is sought by the complaint, or by uniting with the defendant, in resisting the claims of plaintiff, or by demanding anything adversely to both the plaintiff and defendant. The intervention muĩs be by petition or complaint, and be served on the parties to the action against whom anything is demanded, who must answer it as if it were

an original complaint, and the court is to determine upon the intervention at the same time the action is decided.—(See *Wood's Cal. Dig.*, p. 176, art. 807.

At the time this intervention was filed, the defendants had been defaulted, and the order of reference to Mr. *Grant* to take an account of the claims of the creditors, had been made and was still pending.

The intervenors, among other things, allege the institution of this suit and the proceedings in insolvency—the appointment of *Cohen*, *Roman*, *Jones* and *Naglee*, receivers, respectively as above stated, that this suit was instituted by *Woods*, in confederation with *Cohen*, the receiver, and with divers other persons, with intent to hinder and delay the intervenors and other creditors in the collection of their just debts ; that *Cohen* was appointed receiver by the judge of this court, with authority to take and receive the assets of said *Adams & Co.*, and that he did so, on or about the 23d day of February, 1855 : that these assets next went by order of court to *Cohen*, *Roman* and *Jones*, and then to receiver *Naglee* : that the intervenors by attachments, issued out of the courts of the state and levied, have acquired liens upon those assets, etc.

Intervenors then pray for a stay of all proceedings in this action on the part of the parties thereto, except to determine the matter, alleged in the intervention : that it be declared to have been instituted with intent to hinder and delay the creditors of *Adams & Co.*, and that the action and all proceedings had therein, and all rights and claims by virtue thereof, be declared void and set aside, and that the said assets be made subject to the liens claimed by the intervenors, etc.

I can find no evidence of record of a service of this complaint of intervention upon any of the parties ; but defendants *Haskell* and *Woods* made answer April 30, 1856, denying the allegations, charging fraud, collusion, confederation and designs to hinder or delay creditors, etc. There is also a stipulation signed by the attorneys of the plaintiff, defendants and intervenors, dated Aug. 15, 1857, filed Sept. 11, 1857, admitting that intervenors were attachment and judgment creditors of the firm of *Adams & Co.*, as in the complaint of intervention alleged.

On the 11th of September, 1857, *Thomas Holling*, *Rudolph Hurtel*, *Michael Shannon*, *Charles Wheelright*, *Edward Stanley*, *Joseph C. Palmer*, *John H. Dall*, *Merrick G. Reed*, *Aldrich Schaefer*, *John Van*

Adams vs. Haskell.

Bergen, Owen S. Dorman, John Hahn, James Gallagher, Martin Burke, James S. Painter, George O. Whitney, Albert E. Field, and Abia A. Selover, filed a complaint of intervention, containing allegations substantially the same as those contained in that of Savage, Lynch, and others. I can find no evidence of its having been served upon the parties to the original suit or the creditors brought in by the report of Grant, or of any answer, except that contained in a stipulation filed Sept. 11, 1857, signed by the respective attorneys of Adams, Haskell and Woods.

There also appears on the files of Sept. 11, 1857, an intervention merely setting up and claiming a lien by attachment on some of the assets of Adams & Co., in behalf of Alfred Wheelright; no service or answer appears to have been made.

As far as I have been able to examine the mass of papers on file in this action, I can find no other interventions besides those enumerated.

On the same 11th of September, 1857, the complaints of intervention were referred to F. M. Haight, Esq., to ascertain and report to this court the dates and amounts of any liens by attachments, judgments, or otherwise, claimed by the intervenors, with the testimony, etc., and on Sept. 23d following, this referee filed his report, and informs this court that it was made to appear before him "by the original writs of attachment and return, that S. Batchelder, on the 23d day of Feb., 1855, attached certain personal property, and all moneys, debts and effects, credits, or other personal property in the possession or under the control of A. A. Cohen, receiver, belonging to the defendants, Adams & Co., and on the 23d day of June, 1855, made a similar attachment of all property in hands of Edward Jones, one of the assignees of Adams & Co., and I. C. Woods, that said attachment was for the sum of $2,000, and judgment was rendered in the superior court on the 17th day of July, 1855, for $2,150 75 damages and costs."

The report then proceeds to give a statement of various attachments having been issued by the different intervenors, between Feb. 23, and June 23, 1855, and the assets in the hands of Cohen, and, Cohen, Roman or Jones having been attached, judgments obtained, etc., similar in purport to the above, and with his report, the referee returns the original papers and records as the evidence from which he

has drawn the facts reported. (See report of *F. M. Haight Esq.*, on file, etc.)

This report was submitted to the court, and, on the 14th of November, 1857, it was confirmed " without prejudice to such further consideration as to its effect, that might be given it upon final decree." (See opinion and order in minutes, Nov. 14, 1857.)

This being an equity suit, and this report, as also the one made by Mr. *Grant*, auditing the claims of the creditors generally, being for the information of the court, preliminary to decree of distribution, properly come before the court at this time for consideration, and to aid the court in arriving at a conclusion upon the question of distribution.

By Mr. *Haight's* report, and the attachments, it does not appear that any property was taken into the possession of the officer under the attachment; nor is there a description of that attached in the hands of *Cohen, Roman* or *Jones.* The same remark will apply to the executions issued on the 9th of July, 1857, while *Naglee* was the receiver. Whether or no there was any property in their hands, cannot be ascertained by the report, or by the attachments, or any proceedings under them. It is only by evidence, *aliunde*, that this court has any knowledge or information in regard to those matters.

Having thus stated the history and proceedings of the action, so far as I deem it necessary to refer to them, (except the decision of the supreme court upon the intervention of *Lynch* and others, hereafter noticed,) I will now proceed to consider the important points that present themselves.

1st. Are the allegations of plaintiff's complaint sufficient to give this court jurisdiction of the action in equity.

In the original complaint, plaintiff alleges that an agreement for a special partnership between plaintiff and defendant was entered into in his name, by his agent, without power or authority, (he, plaintiff, then and still being a resident of the state of *Massachusetts*.) After which defendants proceeded to carry on the banking and express business under the firm name of *Adams & Co.*, and still continue so to do; that plaintiff was dissatisfied with the agreement, but out of friendship to defendants, with whom he had previously been connected in business, was reluctant to disavow the same, as he was led to believe it

was a limited partnership under the law of this state, and he would not be liable for the debts of the firm, and as he then supposed his agent had acted in good faith. He therefore abstained from a public disavowal of the agreement, but by letters, to defendants, protested against the same, and insisted that it should be set aside. That although he, plaintiff, may be bound to the creditors of the firm, yet he insists he is not bound by the contract. That since the making of it he has been informed and believes, and so charges, that his agent in making the contract, did not act in good faith, but without the knowledge of the plaintiff, and in violation of his duty, received from the defendants, or one of them, a large gratuity for himself, as a consideration for entering into the same. That defendants are still conducting the business in his name, and have created liabilities that exceed one million of dollars, which are liable to be increased.

The amended complaint somewhat changes and enlarges the allegation of fraud and deception.

Now courts of equity will entertain jurisdiction and declare partnerships void, *ab initio*, where there has been fraud, imposition, misrepresentation or oppression, in the original agreement, and will appoint a receiver, etc. Where a partner has a right to dissolve the partnership, it is a matter of course to appoint a manager or receiver of the property. (*Collyer on Partn.*, §§ 360, 361, and note 7; *Story on Partn.*, §§ 6, 232, 285; *Gow on Partn.*, 3 ed., 107; *Edwards on Rec.* 136, 137; *Law v. Ford*, 2 *Paige Ch.* 310; *Martin v. Van Schaick*, 4 *Paige*, 479; *Howell v. Harvey*, 5 *Ark.*, 278; *Tattersall v. Croote*, 2 *Bos. & Pull.* 131.)

If the allegations of the complaint are admitted to be true, it will scarcely be contended they do not disclose a proper case for equitable relief, and the remedial justice peculiar to courts of equity, and which courts of law are inadequate to afford. Then it may be assumed, upon the filing of the complaint, etc., an action was commenced of which this court had jurisdiction in equity, separate (according to the distinction made by the rulings of the supreme court) from law jurisdiction.

The prayer of the complaint asks for a dissolution, account, injunction, and receiver. Defendants, by a stipulation in writing, filed, as appears by the clerk's register, on the same day as was the complaint —which I remember to have seen, but have not found among the pa-

pers—admitted the allegations of the complaint, and consented to the appointment of a receiver, which was made as heretofore stated.

2d.　*Had the court legal authority to appoint the receiver; and what relation does the receiver bear to the court and property.*

The rule in equity is, as I have stated, the appointment of a receiver follows as a matter of course where there is a right to a dissolution. By our Practice Act, §143, subdivision 3, a receiver may be appointed in such cases as are in accordance with the practice of courts of equity jurisdiction. According to this practice, receivers are appointed at various stages of the suit, both before and after answer. *Edwards on Rec.,* 10.

Here the appointment having been made by consent, its regularity at this late day, cannot well be questioned. If it should be irregular, the remedy is by motion, in behalf of a party interested, to vacate the order. When the receiver was appointed, it was for the benefit of *all parties* who might establish rights in the action, or who had an interest in the fund in court. The property that went, or is now in his possession, is in *custodia legis* for whoever can make title to it. It is the court itself which has the custody and possession of the property; the receiver at common law, independent of any statute regulation, is treated as the officer and creature of the court, subject to its orders and entitled to its protection, and he cannot be disturbed by any person, even by a party or all the parties to the action, without leave of the court. (*Edwards on Rec.* 2, 3, and the numerous English authorities cited. *Green v. Bostwick,* 1 *Sand. Ch.* 185 ; *Noe v. Gibson,* 7 *Paige* 513 ; 3 *Paige* 199 ; 5 *Paige* 489 ; 1 *Paige* 558 ; 3 *Paige* 167 ; *Egbert v. Wood,* 3 *Paige* 517 ; 7 *Paige* 583 ; 8 *Paige* 565.)

The order appointing a receiver, followed up by giving the requisite security, is treated as an equitable sequestration of the property, which vests in him, as the officer of the court, without any assignment from its former owner—the object of the appointment being to preserve the property for those who may be entitled to it, that the court may ultimately make such disposition of it as will preserve the legal as well as the equitable rights of every claimant. (*Fairfield v. Weston,* 2 *Sim. & Stu.,* 96 ; *Mann v. Pentz,* 2 *Sand. Ch.* 257 ; *Willson v. Allen,* 6 *Barb.* 542 ; *Albany City Bank v. Schemerhorn,* 9 *Paige* 371, 377 ; *Edwards on Rec.* 83.

It being the rule in equity that, when the court gains jurisdiction of a cause for one purpose, it retains it generally for relief. 2 *Johns. Ch.* 431; 10 *John.* 587; 17 *John.* 384; *Kemp v. Prior.* 7 *Ves.* 249; 10 *Barr.* 373; 12 *Barb.* 61.)

The property, when once in the possession of the receiver, cannot be disturbed; if it is interfered with, then it becomes the duty of the court to protect it, not only against acts of violence, but against suits at law. This it will do by its injunction or otherwise. Even an action cannot be brought against the receiver without leave of the court. *Edwards on Rec.* 125; *Brooks v. Greathead,* 1 *Jac. & Wak.* 176; *Angel v. Smith,* 9 *Ves.* 335; *Johns v. Claughton,* Jacob *Ch.* 572.)

The whole doctrine upon this branch of the case, as gathered from the above authorities, is succinctly and correctly given by justice *Heydenfeldt,* and concurred in by the other judges, in the opinion reported in 6 *Cal.* 113, quoted *supra* (See also *Adams v. Haskell & Woods,* 6 *Cal.* 316.

Equity jurisdiction in this action is not affected by the provisions of our insolvent law, and it is unimportant whether or no there was a special assignment by the parties to the receiver, *Cohen.* Sometimes, in case of real property, courts of equity have required a written assignment; but this is not deemed necessary. Plaintiff and defendants, being bankers, were denied the benefit of the insolvent law. All assignments made by insolvent debtors for the benefit of creditors, are declared void in this state; but it does not follow, that an equitable sequestration of property in an equity suit is an assignment by an insolvent debtor, within the meaning of the insolvent law; nor has it been held, that a judge, acting as chancellor cannot, in a proper case, appoint a receiver, and thereby vest a fund, during litigation, according to the jurisdiction and practice that has obtained in courts of equity. On the contrary, the supreme court, so far as it has indicated its views, adhere to the equity rule. In the case of *Groschen v. Page,* 6 *Cal.* 138, which went from this court, and involved the validity of an assignment for the benefit of creditors, the court says : "The firm was insolvent, and the only way in which the property could be disposed of was by bill in chancery, to distribute it ratably among the creditors."

The above outline of the facts, and general principles of law ap-

plicable thereto, being disposed of, some propositions remain to be considered in order to determine the destination of the funds upon the decree of distribution.

3d. *Was the property in this action subject to attachment or garnishment at any time after it went into the hands of the legally appointed receiver ?*

The recognised rules of law and equity, as above referred to are against it.

The supreme court, by its decision in this action (*ut supra*) when *Cohen* and *Jones* were before them, claiming exemption from the order of this court, directing them to pay over the fund to the new receiver, because it was attached in their hands, declared unanimously that it was not the subject of attachment.

Subsequently, January Term, 1857, in the case of the *County of Yuba v. Adams & Co.* and others, they recognised and adhered to the same principle ; *Brummagim & Co.*, held as *bailees of Cohen the receiver in this action*, $75,000. The county intervened, claiming to have a lien and judgment on the fund. The court says : " The fund being in the custody of the law was not liable to seizure : the only parties contesting are *certain creditors, who claim to have a lien upon the fund by reason of having attached it in the hands of Brummagim & Co.* It appears that the levy of such attachment was made whilst the fund was held by *Brummagim & Co.* as the bailees of *Cohen* ; *a receiver duly appointed by a competent court was, under the former ruling of this court not liable to be attached.* It follows that the defendants " (the attaching creditors,) " have no lien upon the fund in dispute."

Efforts have frequently been made to reach, by attachments, money paid into court, or in the hands of officers of the law,—such as sheriffs, clerks, receivers, assignees in bankruptcy, administrators, etc., and numerous decisions are referred to in Mr. *Drake's* late work on attachments. As a general thing it has been held that funds in the hands of those officers are exempt from attachments. *Drake on Attachments,* §489, and authorities cited. In regard to receivers, the decisions are uniform—at least I have found no adverse authority.

If this fund is subject to attachment, could not the court from whence the attachment issued, under §§ 128, 142 Practice Act, compel its delivery to the sheriff ? A court of equity might, in that event,

by proceedings at law, possibly in an inferior court, be compelled to yield its jurisdiction, and would not have the power even to order payment of the disbursements made under its authority for the protection of the fund.

By the records of the court it will appear that after *Cohen* entered upon the duties of receiver, various efforts were made to attach and obtain possession of the fund in court, by process issued out of, and proceedings had in the late superior court. Parties thus interfering, were by the judge then presiding in this court, held guilty of a contempt of court, and exonerated on condition of relinquishing their pretended claim to the fund. Should these parties, who, under the order of this court yielded their remedy, acquiesced in a principle of law then announced and afterwards promulgated by the highest legal tribunal in the state, now lose all claim to this fund, and some bolder or more fortunate parties be permitted to sweep it all, by the same provisional remedy they were denied? Would it be just or equitable, now to declare, to the mass of creditors, who have in good faith intervened, upon an order made for that purpose in this court, upon the authority of the supreme court, inviting them to present their claims—you have failed to attach the fund held by the court for your benefit, which you had authoritatively been told was not the subject of attachment, and cannot share in the distribution? This would indeed be keeping the word of promise to the ear and breaking it to the hope. To so hold seems to me would neither be consonant with law, which is said to be the embodiment of human reason, nor with equity, which in its true and genuine meaning is the soul and spirit of all law.

But it is contended that the supreme court by another decision—July term 1857, in the matter of this intervention of *Lynch* and others—made in this action, have in effect overruled the decisions previously made, and settled the law upon this point contrary to the doctrine as theretofore announced. I do not so understand the opinion or judgment. I consider it the duty of this court to follow the authoritative decisions of the supreme court: they are imperative instructions to which any adverse views entertained by this court must yield. This decision in the matter of *Lynch* was upon writ of error: the judgment removed I am informed of; the transcript or return to the writ of error I did not see or certify; nor to my recollection was it made under the direction of this court. I am therefore uninformed as

to their contents, and do not know who among the creditors or parties had notice of the writ or appeared therein.

In the *English* and *United States* courts the practice on writs of error are to some extent regulated by statute. In this state we have no statutory provisions—an appeal only being provided for—and the common law must be our guide. In *England* the writ issues out of the court of chancery on final judgment in common law and not in equity cases, and removes only the record. It does not lie for error in fact. The return is made by a transcript and the original, taken by a judge in person, or by a transcript certified according to practice which is not the same in all the courts. Now I must presume this writ of error was regularly issued, and that all proceedings under it were regular and in due form, and I only have referred to it in this connection with a view of determining by the general law and by the judgment and record removed, and the judgment of the supreme court thereon, what was decided and what are the instructions by the decision to this court.

The judgment removed is referred to in the opinion of the court as follows: that the court " permitted the intervention to be filed, but refused to stay proceedings or afford affirmative relief."

The record, directly connecting itself with the judgment, was the complaint of intervention and answer thereto, and I suppose this record was before the supreme court. It must be remembered, previous to the writ of error, no trial or hearing had been had before this court upon the intervention ; that, as the judgment reads, was refused.

The law did not require the whole proceedings in this action to be sent up, and I cannot infer from the fact that a writ of error issued to remove a particular judgment, affecting the intervenors, that the whole proceedings were before the court. I am supported in my conclusions by the opinion of the court, and some expressions therein contained. In the opinion, no allusion is made to the entry of the default—the order of reference to take an account of all claims, (including those of the intervenors,) or the report of the referee thereon and its confirmation, all which had transpired before the writ of error was issued or returned.

In the opinion, the court says: " The proceedings are under the control of the partnership alone, and may be dismissed at the will of the party."          :          :          :          *          *          :

" The creditors are not parties.   It is a suit between the members of the partnership, and until a decree of dissolution, the plaintiff may deal with it as he pleases."

Now, it appears here of record that at the time the writ of error was presented to this court, and the judgment it removed· was entered, there was a default and a decree of dissolution, and that the creditors, to the extent of more than one and a-half millions of dollars had intervened, and had their claims audited and allowed, under the authority and order of the court; and among them will be found many, if not all, of those who have filed special complaints of intervention.  These facts could not have been before the supreme court.

Again, and in conclusion, the court says : " For the purpose of this investigation, it makes no difference whether the appellant obtained his judgment before the decree of dissolution ; for, if the proceeding was instituted for *the purpose* of hindering, delaying or defrauding creditors, it may be attacked on that ground at any time before a final distribution of the assets."

Now, the only evidence of any such purpose as is mentioned, before the court, was the allegations contained in the pleadings.   The intervenors had introduced no proof in support of the allegation of fraud, or as to the time, or manner of levying their attachments; and the record contained none.

The decision of the court, as I understand it, is to this effect :  The judgment removed from this court is reversed, and the intervenors are entitled to be heard upon their complaints of intervention.  I have carefully considered it with a view of treating it with respect, and performing my duty herein ; and I am unable to come to any other rational conclusion.   I cannot suppose or find anything in the opinion to warrant the conclusion here claimed, that the court intended to instruct this court that the intervenors are entitled to be paid what they claim by their intervention, and without proofs, when it has been made to appear that at the time their alleged attachments were made, the fund claimed was in the custody of this court in an equity suit pending and undetermined.

4th.   *What standing in the action and before the court, have the special intervenors, and to what relief are they entitled?*

The plaintiff, in his complaint, asks that the partnership assets be distributed among the creditors ; to this no objection is interposed by

the defendants. The order of reference was made for all the creditors to appear and prove claims, etc., to enable the court to carry into effect one of the objects of the action. The order was general, and applied to all and every kind of claim whether or no it was entitled to preference or priority. Those who then appeared and proved their claims, are in the position of intervenors, by the express order and consent of the court. The special intervenors had the same rights and privileges in regard to notice, etc., as had the mass of the creditors. I have not examined the entire list of the creditors and claims contained in the voluminous report of the referee, but have done so sufficiently to ascertain that at least a majority in interest of the special intervenors did appear and have the same claims audited, which are set forth in their special interventions. Is not this an election of remedy by which they are concluded? By their complaints they neither join with the plaintiff in claiming what is sought, nor with the defendants in resisting; nor do they demand anything adversely to both. They claim to be creditors with special liens, which entitles them to preference of payment out of the partnership assets. These liens as they have shown, were acquired since the commencement of plaintiff's action and while the fund was in the custody of the court for the purpose of distribution. Neither plaintiff or defendants have any pecuniary interest in the interventions—as against them they are nugatory—the only parties to be affected by them are the mass of creditors, made parties under the order of the court, among whom are at least a portion of the intervenors. If we should desire to indulge in the niceties of reasoning, the interventions might, to some extent, be regarded as interventions against the intervenors themselves and the creditors at large. The creditors, however, have not been served, and strictly are not bound to notice the interventions.

In the matter of *Holling*, *Hurtell* and others, and that of *Wainwright*, the complaints were filed and referred on the same day, on motion of the intervenors therein, without service or answer of any kind, except as is contained in the facilitating stipulation of the plaintiff's and defendant's, attorneys. The creditors do not appear to have had any part or voice in the matter. The court will not allow the plaintiff or defendant to stipulate away their rights, if it is claimed that the stipulations are of such effect. No proofs in the case of either intervention have been introduced to sustain the charges and allegations

of fraud. Should this court, then, pronounce that the plaintiff has fraudulently instituted this suit, for the purpose of hindering, delaying or defrauding creditors, when the parties have voluntarily surrendered their property to the control of the court and asked that it be distributed among their creditors, and that the mass of the creditors, who are in no way implicated, should be punished by this suspicion of fraud, to such an extent as would be equivalent to depriving them of all participation in the fund?

The acts of the parties and the allegations in the plaintiff's complaint, in the absence of proof, ought to rebut any presumption of fraud against them, and as for the mass of the creditors, they are not charged with or implicated in the fraud. But I am unable to discover upon any principle of justice, how fraud, if clearly proven, could give to the intervenors a right to attach a fund in court, or obtain a preference of payment over the other creditors. If there has been a fraudulent combination or confederation between the parties, or any of them, and the receiver, *Cohen,* or any other officer, does it result as a consequence that all the creditors, except the intervenors, must suffer? If these allegations of fraud are true, the remedy is against the receiver and upon his official bond, for any violation of duty whereby the fund has been diminished, or the estate defrauded.

In connection with this branch of the case, it may be noticed that the validity of the attachments in other respects is not beyond question. It has been held in this court, and elsewhere that an attachment is a *remedy* not a *lien,* to be pursued according to the requirements of the law, whereby a security is obtained for the satisfaction of any judgment that may be recovered. The statute regulates the whole proceeding; the making the levy; taking the property when it can be done; how it may be released; the proceeding when possession cannot be obtained; examination of the party, and order of court to compel delivery to the sheriff; the sale and appropriation by that officer, upon judgments according to priority, etc., are all specially defined. Upon the report of Mr. *Haight,* and by the attachments themselves, it is not clear that the intervenors have pursued their remedy according to the requirements of the statute.

If, however, they have done so, can they not enforce and perfect it, under the provisions of the act, in the courts from whence the writs issued, aided if necessary, by the judgment of the supreme court on

appeal? It is true, courts of equity will sometimes settle preferences and liens in cases of conflict, when there is no other mode of doing it; but this is not a suit originating out of a controversy of such a nature. If the property was in the custody of the court at the time it was attached, should not the consent of the court have been first obtained; or was it necessary to garnishee the court? It was not a proceeding *in rem*, inasmuch as the officer did not get possession of the property. Most of the attachments were served on *Cohen;* by the statute he became liable personally for the moneys, etc., in his possession; he, by order of the court, transferred the property to the assignees; and the assignees again to *Naglee*. Did the liability, *ex-officio*, go with the transfer, and did *Naglee*, *ex-officio*, become liable?

The following conclusions are supported by the authorities, and in my opinion are inevitable:

That the fund and property in the custody of the court in this action was not the subject of attachment in the hands of its duly appointed receiver.

That the special intervenors have no lien by attachment, judgment or execution upon the fund in court in this action, as claimed in their complaints which entitles them to priority of payment out of that fund.

That the substantial allegations of the complaints of intervention are not proven, and that the other creditors made parties by the order of reference, and report thereon, to take an account of claims, etc., are not affected or bound by anything therein contained.

5th. *It remains to be determined what should be the order and decree of distribution.*

By the reports on file and confirmed, it appears there is a balance of $50,000 now in the hands of the receiver ready for distribution. That there is also about the sum of one hundred thousand dollars belonging to the fund in litigation, besides a claim against a former receiver, bills receivable, etc.

The decree should be final as to the distribution of the whole fund so that there will remain nothing to be done but to make the payments according to the decree, as the funds may now be, or may hereafter become, ready for distribution.

As I have heretofore stated, it is a doctrine of courts of equity, that when the court has gained jurisdiction of a cause for one purpose, it usually administers general relief. Actions may be instituted for the

purpose of settling preferences of payment and priorities among existing liens in cases of conflict, and where there is no other safe or convenient remedy. In such cases and generally, says Mr. *Story* (1 *Eq. Juric.* §§ 553,554,) in the course of the administration of assets, courts of equity, according to the maxim, *Æquitas sequitur legem,* follow the same rule in regard to legal assets which are adopted in courts of law. In like manner they recognise and enforce all *antecedent liens* and charges *in rem.,* according to their priorities. Equitable assets as a general rule, are distributed equally and *pari passu* among the creditors, without any reference to the dignity or priority of the debts ; for courts of equity regard all debts in conscience as equal, *jure naturali,* and equally entitled to be paid ; and here they follow their own favorite maxim, equality is equity, " *Æquitas est quasi æqualitas.*" If the fund falls short all the creditors are required to abate in proportion.

Says chancellor Kent (*Moses* vs. *Mugatroyd,* 1 *John Ch.* 130.) " the general doctrine is to encourage as much as possible the idea of equitable assets, because equality in the payment of debts is equity, and the rule of distribution in chancery, is founded on principles of natural justice. When the assets are considered as equitable, then it is well and uniformly settled that they are to be distributed among all the creditors, *pro rata,* without giving preferences."

If the intervenors had legally levied their attachments before the property went into the custody of the law, equity would recognise and reward their superior diligence ; but, when the act by which they claim to have obtained their priorities was in violation of law, in contempt of the authority of this court, and, I am almost inclined to say, an inequitable attempt to exclude the mass of the creditors from sharing this fund, it would be well to recall the maxim, which, as has been said, lies at the foundation of equity jurisprudence—" He who seeks equity must do equity."

The fund in court is all partnership property. I believe there have been no debts proven against the individual members of the firm, but all are against the partnership ; there are no priorities or preferences in other respects among the debts allowed, and no liens upon the funds in court ; it matters not, therefore, whether the assets be deemed legal or equitable, for in either case, according to the equity rule, they must

Adams *vs.* Haskell. .

be distributed *pro rata* among all the partnership creditors whose claims have been reported and confirmed under the orders of this court, to the extent that they have been confirmed. After paying these, the individual debts of the partners should next be paid if any there be, etc.

This will be placing all the creditors upon an equality, and in the same position they were when this fund went into the possession of the court. This, according to my views, is equitable and just to all, and wrong to none; and to see justice prevail, is the only object that has induced me to give this matter this extended consideration.

Should I be in error the whole case will be in condition for review, upon the whole facts and proceedings, before the supreme court, where by its decree the various questions arising may be settled, and the decree of this court be modified or a new one ordered as may be deemed equitable and just, which will be a final determination of the order of distribution.

I found this action pending—a legacy from my predecessor—when I entered upon this office. It has progressed slowly and been attended with great delays which, as the records will show are not chargeable to the court. In its various proceedings and ramifications it has entailed upon the court a great deal of labor and investigation; without, on many occasions, the assistance of counsel, whilst the parties who are interested and awaiting the result may be counted by hundreds. In behalf of the court, I can say when the various matters have been submitted for decision, I have disposed of them within a reasonable time, as soon as the current business of the court allowed me opportunity for examination.

Opposition, appeals, difficulties and embarrassments have attended most of the orders and judgments of the court made in this action; sometimes to compel obedience to them has involved the performance of unpleasant duties, and the exercise of extreme remedies which were calculated to engender bitter and resentful feelings. In those matters as well as in announcing this opinion, I have acted from a sense of justice and in discharge of what I considered a duty.

A decree of distribution ordered as is herein indicated.